**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAVID T. GILCHRIST and CHRISTOPHER A. NOVINGER,**<br><br>**Defendants,**<br><br>**and**<br><br>**REBECCA NOVINGER,**<br><br>**Relief Defendant.** | ) | **No. 3:26-cv-2953**<br><br>**JURY DEMANDED** |

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") alleges:

1. From March 2021 through at least October 2025, Defendant David T. Gilchrist raised more than $1.85 million from at least 22 investors through four fraudulent securities offerings.

2. In the first offering, in March 2021 ("First Offering"), Gilchrist told a prospective investor he would use the investor's money to advance

settlement payments to class action plaintiffs. In return, the investor would receive a guaranteed 12.5% return every 90 days. After hearing Gilchrist's pitch, the investor invested $220,000 in the venture.

3. In the second offering, between April 2023 and September 2024 ("Second Offering"), Gilchrist told another prospective investor that he would use the investor's money to buy tax liens on properties with delinquent taxes. To hear Gilchrist tell it, these liens had the virtue of providing investors with large, short-term profits amounting to a 20% return, with minimal risk. The investor ultimately invested a total of $134,718 in eight partnerships that Gilchrist created, purportedly to buy tax liens.

4. In the third and largest offering, from March 2023 through September 2024 ("Third Offering"), Gilchrist told prospective investors he would use their money to buy tax liens on Texas properties with delinquent taxes. If a property owner failed to repay the investors the amount owed in taxes within a set period of time—together with 25% interest—the investors would assume full ownership of the property. Thus, Gilchrist assured investors, regardless of whether the property owner repaid them, they would profit handsomely.

5. Defendant Christopher "Aaron" Novinger ("Novinger") played a vital role in the Third Offering, finding investors for Gilchrist and soliciting their investments; handling the paperwork; repeating Gilchrist's

misrepresentations; and facilitating the transfer of investor money to Gilchrist. Novinger did so even though he had been permanently barred by the Commission from association with any broker. *See In the Matter of Christopher A. Novinger*, Admin. File No. 3-17325 (June 30, 2016). Novinger's broker activities in furtherance of the Third Offering violated that bar. Novinger also effectively vouched for Gilchrist, telling at least two investors that Novinger had personally invested in the Third Offering. That wasn't true. Novinger never invested in the Third Offering. Based on Gilchrist's and Novinger's representations, 18 of them collectively gave Gilchrist about $1.3 million to buy tax liens.

6. In the fourth offering, from February 2025 through October 2025 ("Fourth Offering"), Gilchrist and Novinger told two prospective investors that Gilchrist would buy tax liens with their investment proceeds, and they promised a 20% annual return. The investors found the offer appealing and made a cumulative investment of $200,000.

7. Novinger continued actively soliciting new investors for the Third and Fourth Offerings even as he grew increasingly concerned that Gilchrist may not have actually purchased tax liens with the investment proceeds. For months he repeatedly demanded proof that Gilchrist had purchased the tax liens. Gilchrist ***never*** supplied such evidence to Novinger. But Novinger continued playing an indispensable role in these offerings.

8. As it turns out, Novinger's concerns about Gilchrist were well-founded. Gilchrist repeatedly lied to the investors in all the offerings. He never used investor money to buy class action settlement payments or tax liens. Instead, he used it for his own purposes and to make Ponzi-like payments to other investors.

9. Gilchrist also used the Third Offering investors' money to pay Novinger for his services in furtherance of the Third Offering. Gilchrist made these payments to Novinger's wife, Relief Defendant Rebecca Novinger, who had no legitimate claim to the money.

10. The SEC brings this lawsuit to hold Defendants Gilchrist and Novinger (together the "Defendants") accountable for their misdeeds and to protect the investing public from future violations of the federal securities laws.

## JURISDICTION AND VENUE

11. The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

12. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

13. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Texas and elsewhere.

14. Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS AND RELIEF DEFENDANT

15. **Defendant David T. Gilchrist**, age 70, resides in Grand Prairie, Texas. Gilchrist is an attorney licensed in Texas and is the sole proprietor of the Law Office of David T. Gilchrist. He has practiced law since 1984.

16. **Defendant Christopher "Aaron" Novinger**, age 50, resides in Burleson, Texas. Novinger was in the business of providing retirement planning services throughout the period of the Third and Fourth Offerings. He also hosted a radio show from at least 2023 to 2024, and a podcast from at least 2024 through at least May 2026, both called "Business for Breakfast." In 2016, in a previous SEC enforcement action, Novinger consented to an Order by this Court: (a) enjoining him from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act and

Rule 10b-5 thereunder; and (b) ordering him to pay a total of $349,478 in disgorgement, prejudgment interest and civil penalties. *See SEC v. Novinger, et al.*, No. 4:15-cv-00358, dkt 37 (N.D. Tex. June 6, 2016). The Commission thereafter issued a settled Order that, among other relief, barred Novinger from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization ("Commission Order"). *See In the Matter of Christopher A. Novinger*, Admin. File No. 3-17325 (June 30, 2016).

17. **Relief Defendant Rebecca Novinger** ("Relief Defendant") is married to Defendant Christopher A. Novinger and resides in Burleson, Texas. She is included as a relief defendant in this lawsuit solely because, as detailed below, she received investor proceeds for which she has no legitimate claim.

## FACTS

18. From March 2021 to at least October 2025, Gilchrist raised at least $1,852,794 through the fraudulent offer and sale of securities to at least 22 investors from four states. Gilchrist misrepresented material facts to the investors, forged documents, and misappropriated the investors' money. During the Third and Fourth Offerings, Novinger also made material misrepresentations to prospective investors and actively solicited investors despite his fears that the offerings were fraudulent. Novinger also illegally acted as an unregistered broker in connection with the Third Offering and

substantially assisted in Gilchrist's fraud in connection with the Third and Fourth Offerings.

**The First Offering**

19. In March 2021, Gilchrist texted Investor A, who lives in Arlington, Texas, asking if he wanted to invest in litigation class action settlements. In a series of text messages with Investor A, Gilchrist explained that he was partnering with a Texas law firm ("Law Firm") to advance settlement payments to class action plaintiffs.

20. Gilchrist's text message described the investment opportunity to Investor A:

> It is a sweet deal. It pays 12 1/2 % every 90 days. I have two friends that have been in it for 6 months already. One has 100k in it and another has 300k in it. They collect their interest every 90 days and use it to pay off their houses. I am going to get in for 100k and use the money to pay my daughters tuition for the next 2 years at veterinarian school. You can decide what you want to do but it is too good to pass up for me.

21. Investor A was intrigued. "So is it buying debt?" he asked. "No," Gilchrist responded, "not at all." Gilchrist continued:

> [I]t is advancing money on settled product liability cases and getting interest on them being paid from federal court every 90 days. It is the same these companies do [sic] that advertise on tv about do you have settlements that need to be advanced and they do it. We are just undercutting them and getting the business.

22. Investor A asked if the investment would be risky. "[N]o," Gilchrist responded, "the cases are already funded by a class action suit with a total of 10.1 billion already set aside for the settlements. The money is guaranteed." Investor A continued pressing Gilchrist: "Is there anyway [sic] for us to get screwed in this deal?" "None that I can see," Gilchrist responded, "I believe I have all the basis [sic] covered."

23. Investor A was convinced. "Well it's nice to have a secure way to make some decent money," he replied.

24. Next, Gilchrist brainstormed with Investor A about how the latter would fund his investment. They discussed Investor A either taking out a loan on his home (which Gilchrist claimed he was doing to fund *his own* investment in the First Offering), or liquidating Investor A's retirement savings, even if doing so meant paying a large up-front penalty and taxes.

25. Gilchrist offered to help Investor A apply for a home loan, but ultimately Investor A took the money from his 401(k) account. "Looking into the 401k route will have to pay a 10% penalty and then next year pay taxes on it," Investor A texted Gilchrist. "If I needed to get some of the interest paid next year [from the investment] I could do that right?" "Absolutely," Gilchrist assured him, "I was going to recommend that also."

26. To further entice him, Gilchrist texted, "Once we get a million invested our interest rate goes up to 13%"—up from the 12.5% quarterly rate—

"so the sooner the better." "Awesome that's good news," Investor A responded.

27. On or about April 1, 2021, Gilchrist emailed Investor A a partnership agreement—which Gilchrist himself drafted—stating that the partnership would make an "investment in federal hip replacement class action settlements" by "loan[ing] monies . . . for the purposes of purchasing liquidated settlements." The agreement referred to a $280,000 investment by Gilchrist and a $300,000 investment by a third party.

28. Based on Gilchrist's representations and after reading the partnership agreement, Investor A decided to invest $220,000, which he wired to an account held by Gilchrist's law practice. Gilchrist promised to use Investor A's investment proceeds solely to finance the settlement payments.

29. The partnership agreement was an investment contract under the federal securities laws. Although the partnership agreement was styled as a "general partnership," Gilchrist was fully in charge, as the agreement designated him the managing partner and vested all operational authority in him. Investor A had no responsibility other than making his investment. Once he did so, the rest was up to Gilchrist, whose expertise and efforts Investor A depended on for profits.

30. Investor A was not a lawyer, had no experience with class action settlements, and had no connection to the Law Firm. Under the agreement, he

had no access to partnership records or accounts, and no means to remove Gilchrist as managing partner absent Gilchrist's agreement.

31. On May 14, 2021, after Investor A invested, Gilchrist emailed him a document titled "Assignment of Interest," purportedly signed by the Law Firm's principal, confirming the promised 12.5% quarterly returns.

32. As further evidence of the legitimacy of the venture, on September 24, 2022, Gilchrist texted Investor A an image of a bank statement showing the Law Firm as the accountholder, and reflecting an account holding the combined value of Gilchrist's and Investor A's investments:


TRINITY BANK
3500 W. Vickery Blvd. • Fort Worth, TX 76107 • 817-763-9966

Account Number: *****942
Date: June 30, 2022
Enclosures:
Page Number: 1of 2

BAILEY & GALYEN
TRUST
1901 AIRPORT
FREEWAY
BEDFORD, TEXAS
76021

STATEMENT SUMMARY

2,337,086.92

CHECKING

Beginning Balance
$135,507.92
Deposits / Misc Credits 23
Withdrawals 11
** Ending Balance
2,337,086.92
Enclosures

Credits

| Date | Deposits |
|---|---|
| 6/01 | 7,500.00 |
| 6/01 | 34,250.00 |
| 6/06 | 633.00 |
| 6/06 | 1,342.11 |
| 6/06 | 3,000.00 |
| 6/06 | 2,000.00 |
| 6/08 | 833.33 |
| 6/08 | 2,000.00 |
| 6/10 | 1,416.67 |
| 6/10 | 2,833.34 |
| 6/13 | 2,000,000.00 |

33. It was all fiction. Gilchrist had no such arrangement with the Law Firm. And he had made no such investment himself. There was no other partner. These were lies Gilchrist had made up to obtain money from Investor A.

34. Gilchrist then used Investor A's money for personal purposes, including to pay investors from previous, unrelated ventures.

35. After Investor A invested, Gilchrist continued to deceive Investor A. The Law Firm's principal had never signed the Assignment of Interest, and Gilchrist had fabricated the account statement.

36. To date, of the $220,000 that Investor A invested, Gilchrist has repaid only $40,000.

**The Second Offering**

37. In or around April 2023, Gilchrist met Investor B, a resident of DeSoto, Texas. Soon thereafter, Gilchrist pitched an investment opportunity to Investor B in a phone call. He explained to Investor B that Texas counties may sell a tax lien on a property with delinquent taxes. After the tax lien is sold, Gilchrist explained, the property owner has a specified amount of time to repay the lienholder—here, the partnership—the amount of the tax lien plus an additional 25% in interest. If the property owner failed to do so, he told Investor B, the lienholder would become the property owner of record.

38. Each investment was structured as a separate "general partnership" and documented in partnership agreements that Gilchrist drafted. Each partnership agreement stated that "the purposes of the Partnership shall be the Partners['] desire to enter into an agreement to purchase tax liens" on a specific property whose address was set forth in the partnership agreements. The agreements also specified the interest amount and ownership interest of each partner.

39. The partnership agreements gave Gilchrist discretion about how he spent partnership proceeds, but in calls he assured Investor B that he would only use those proceeds to buy tax liens.

40. Gilchrist told Investor B that the partnerships would receive a 25% return. Gilchrist also told Investor B that this return would then be divided such that each of them would receive a 20% return on their investments, while Gilchrist would receive any funds left after Investor B and he had received their individual investment returns.

41. Gilchrist's responsibilities, he told Investor B, included finding a suitable property that was delinquent on taxes; purchasing the tax lien; communicating with the property owner; drafting the necessary documentation; collecting the payments; and, if necessary, selling the property.

42. By contrast, Investor B—who had no experience with tax liens—would have no responsibility other than investing his money. He would have no authority over the venture; no access to bank accounts or investment records; no ability to monitor whether liens were purchased; and no direct access to the property owners. In other words, the success of Investor B's investment depended entirely on Gilchrist's efforts and expertise.

43. Before forming the first two partnerships, Gilchrist told Investor B he lacked the funds to contribute cash. Instead, Gilchrist said his contribution would be buying tax liens, communicating with property owners, and collecting

interest, which Investor B accepted. Consequently, the first two partnership agreements listed Gilchrist as a partner with a 0% ownership interest. Gilchrist nonetheless controlled every aspect of the first two partnerships.

44. Based on Gilchrist's representations to him, Investor B made his first investment in April 2023.

45. Thereafter, Investor B sought proof that Gilchrist had in fact bought the tax lien. On May 2, 2023, Gilchrist emailed him a document called a "Redeemable Deed of Trust," notarized by Gilchrist, which appeared to bear the property owner's signature. The document stated that if the property owner failed to pay the principal plus interest, the owner authorized the partnership to foreclose on the property.

46. The document comforted Investor B about the legitimacy of the investment.

47. On May 21, 2023, after Investor B had made his second investment, Gilchrist emailed him a similar Redeemable Deed of Trust, also notarized by Gilchrist. The document provided Investor B with added comfort and led him to invest in six more deals with Gilchrist.

48. For the final six partnerships, Gilchrist told Investor B—through text messages and in the partnership agreements Gilchrist drafted—that he would also invest money in those partnerships alongside Investor B. Gilchrist conveyed this to Investor B in texts regarding at least three of the partnerships,

and stated it in all of the partnership agreements, which he emailed to Investor B.

49. In March 2024, Gilchrist told Investor B that four additional investors were joining them for one of the partnerships, totaling more than $99,000. Investor B then invested, encouraged that Gilchrist and the other partners were investing alongside him, and satisfied with Gilchrist's year-long history of making timely payments.

50. All told, between April 2023 and September 2024, Gilchrist offered and sold Investor B eight investment contracts for a total of $134,718, with ownership interests ranging from 16.6% to 100%. Investor B transferred the money to Gilchrist's account. Under the terms of the agreements, Investor B would earn 20% interest on his investments in seven partnerships, and 25% interest on the eighth.

51. Gilchrist's statements to Investor B were lies. Gilchrist never bought a single tax lien with Investor B's money. Gilchrist never invested his own money, and never told Investor B that he had not done so. There were no other investors in the Second Offering. There were no contracts with property owners. None of the properties, at the time Investor B made the investments, were subject to tax liens. None of the property owners signed any tax lien contracts with Gilchrist. Only one property owner even knew Gilchrist, but had never spoken with him about a tax lien, or signed a contract with him related to

tax liens. As for the "Redeemable Deeds of Trust," the purported "owners" referenced in the deeds—whose signatures were forged—were not the actual owners of the property.

52. Rather than purchase tax liens, Gilchrist used Investor B's money for his own personal and unrelated business purposes and to pay other investors from other ventures.

53. In June 2024, Gilchrist began missing interest payments owed to Investor B.

54. Investor B's initial inquiries about the late payments went unanswered. In October 2024, Gilchrist apologized for not responding:

> I'm sorry I didn't get back with you the State Bar sent a bunch of lawyers to North Carolina to help home owners with FEMA claims and I was one of them. I am basically stuck out here and have limited access to working phones and electronics so I haven't been able to do much back there. We were only supposed to be here for 2 weeks but it is such a disaster we haven't made it back yet.

55. Gilchrist hadn't been stuck in North Carolina. Fitness center records confirm he visited his Mansfield, Texas gym on all but two days that month, including the day he sent that text, and his debit card records show purchases at Texas retail locations throughout the period.

56. A few weeks later Gilchrist gave Investor B a new excuse, this time about his health:

> I ended up in the emergency room here in Chattanooga and had to have a colectomy and am just now able to leave the hospital.

57. Gilchrist wasn't in Tennessee recovering from emergency surgery. Just two hours before writing that text he was at his gym in Mansfield.

58. Gilchrist ultimately repaid much of Investor B's principal, much of it with investment proceeds from other offerings. He still owes Investor B more than $8,300.

**The Third Offering**

59. Between March 2023 and September 2024, Gilchrist and Novinger raised $1,298,076 from 18 investors (Investor C through Investor T) across four states. Gilchrist and Novinger offered and sold promissory notes in a venture that purportedly invested in the purchase of real estate tax liens.

60. Novinger played a vital role in the Third Offering. He found the investors and solicited them to invest. At the outset of the offering, Novinger touted to Gilchrist his ability to raise money from investors or, as Novinger put it, "how you get your clients to bite."

61. Novinger's pitch was exemplified by his text to a prospective investor on or about May 5, 2023, which Novinger shared with Gilchrist:

> Happy Friday Cheryl! I just heard from the tax lien attorney and he has 3 liens for us to grab. The $13,700 lien is already reserved so there are 2 left. Tell me how many and which ones do you want. 6 month notes paying you 10%. Because of the size of the investor list I'm giving you 60 minutes before I move to the next person.
>
> (ALREADY RESERVED) Grand Prairie, Texas 75051 is $13,700.
> Grand Prairie, Texas 75051 is $12,637.
> Grand Prairie, Texas 75050 is $13,307.

62. Novinger's sales tactics proved successful. Sixteen of those who ultimately invested in the Third Offering were his clients. He gave them information about the offering; arranged for them to speak directly with Gilchrist; oftentimes participated in these sales calls with Gilchrist; and suggested to some how much to invest.

63. Gilchrist (in phone calls) and Novinger (both in person and on calls) explained to prospective investors that Gilchrist would use all investment proceeds to buy tax liens. In return—as reflected in the documentation given to investors—they would receive a 20% annual return, half at six months, and the rest in a year, together with the return of their principal.

64. From May 2023 through at least September 2024, both Gilchrist and Novinger repeatedly told prospective investors that profits would be

derived either from the payments made by the property owners or, if an owner failed to repay the lienholders, by the sale of that property.

65. Throughout, Gilchrist and Novinger touted the Third Offering as a low-risk proposition. For instance, in May 2023, Novinger told Investor F in an email that Gilchrist was securing the investment with a lien on Gilchrist's own house. And in March or April 2024, Gilchrist assured Investor Q that the investment was legitimate.

66. Novinger told at least Investor G (in May 2023) and Investor M (in late 2023 or January 2024) that he was personally investing in the offering.

67. Based on Gilchrist's and Novinger's lies, at least 18 investors collectively gave Gilchrist $1,298,076 to invest in the Third Offering.

68. Gilchrist drafted a promissory note, which he pre-signed and gave to Novinger in May 2023 to complete and provide to investors as evidence of their investment. Later that same month, Gilchrist directed an acquaintance to sign Gilchrist's name to a blank promissory note and send it to Novinger. Gilchrist authorized Novinger to use this second promissory note for the same purpose as with the first, pre-signed promissory note. Other than the signature and the investor-specific details, the promissory notes were all substantively identical.

69. The promissory notes reflected the promised 20% annual return. They stated they were "secured and guaranteed by a lien on real property" (though that provision was titled "Unsecured").

70. Once an investor decided to invest in the offering, Novinger handled the logistics. He shepherded the investors through the investment process, providing them with the promissory notes and instructing them how to complete them. After investors signed the promissory notes, Novinger forwarded the notes to Gilchrist. Novinger then delivered the completed promissory notes to the investors. Novinger also facilitated the transfer of money from the investors to Gilchrist. On at least one occasion, Novinger took custody of an investor's check.

71. Beginning in early 2024, Novinger—with Gilchrist's approval—emailed investors, inviting them to roll over their principal into a new 12-month note, this time at 18% interest. For at least some investors, Novinger expressly recommended that they do so.

72. At that time, Gilchrist had been making the agreed-upon interest payments. These payments gave investors the comfort they needed to roll over their principal into a new promissory note—even if it meant deferring return of their principal, and even though the new note offered a lower interest rate.

73. The investments in the Third Offering were securities in the form of promissory notes and investment contracts. The investors' fortunes were

dependent solely upon Gilchrist's efforts and success in tax lien investing. Investors reasonably expected profits derived from Gilchrist's efforts, ranging from between 18% to 20% annually.

74. Over time Novinger became increasingly concerned about the Third Offering's legitimacy and whether Gilchrist had actually purchased tax liens with the investment proceeds. So beginning in at least June 2023, Novinger asked Gilchrist for proof of the lien purchases. Gilchrist ignored him. Novinger asked again, to no avail. And so it went—for months.

75. Despite Gilchrist's apparent refusal or inability to provide such proof, Novinger continued soliciting new investors and encouraging existing ones to roll over their investments.

76. On August 10, 2023, for instance, Novinger texted Gilchrist another demand for proof of the tax liens, "so we know they've actually been purchased." "[M]any of these clients," he explained to Gilchrist, "were already affected by another bad investment." Thus, Novinger continued:

> It's already almost unbearable to have to meet with these clients who lost money with a shady investment (that I had nothing to do with). I won't make it out of this alive if my clients are taken advantage of.

77. Gilchrist offered no such proof. But that didn't stop Novinger—just hours after his demand—from soliciting still more investors. On August 10, 2023 he texted Gilchrist:

> Just finished another client mtg and they have cash they're putting in. I have a call with them on Tuesday to figure out if they are putting in 25k or 50k.
>
> I told you guys it takes a little bit to get it going but once it starts, it's hard to slow it down. I'll keep the funds flowing.

78. This cycle kept repeating itself. About three months later, nothing had changed. "We're now at six months that [sic] we've been doing tax liens," Novinger said in a voicemail to an acquaintance on November 29, 2023, "and I don't think to date that David [Gilchrist] has given us a single one of the tax liens."

79. Yet months after that voicemail, in February 2024, Novinger was boasting to Gilchrist about his successful solicitation of still more investment proceeds: "I got tons more coming!" he texted. He was right. By September 2024, Novinger had brought in at least three new promissory note investors, and at least seven roll-overs or additional promissory note purchases by existing investors.

80. Novinger was not dependent on Gilchrist for proof of the tax liens. Novinger knew he could have independently searched a county's website for

proof that Gilchrist had bought a tax lien from the county. But Novinger never did so, nor did he take any other steps to confirm that Gilchrist had in fact purchased tax liens.

81. Moreover, Novinger knew how Ponzi schemes work and the harm they cause. He runs a purported charitable event called "Pedaling Against Ponzis," an annual solo bicycle ride to supposedly benefit victims of another Ponzi scheme that had victimized several of his clients. Novinger also discussed Ponzi schemes on his podcast.

82. As it turned out, Gilchrist never used investors' money to buy a single tax lien. He instead used their money to make Ponzi-like payments to other investors in the Third Offering, to pay investors from other offerings, and to cover personal and unrelated business expenses.

83. Gilchrist also used investor proceeds to compensate Novinger for his role in soliciting investors. Under their agreement, Gilchrist was to pay Novinger 6.6% of each investor's contribution, disbursed in two installments: the first to be made six months after the investment, the second at the one-year mark. In 2023 and 2024, Novinger repeatedly texted Gilchrist asking when he would get paid the amount he was owed.

84. At Novinger's request, Gilchrist directed the commission payments to Rebecca Novinger's bank account. From January 2024 through August 2024, Gilchrist paid Novinger a total of $14,131 (amounting to less than

the agreed-upon 6.6%) in at least six electronic transactions. Gilchrist made the first three payments about seven months after the initial investments; he was late with the remaining payments.

85. Rebecca Novinger did not provide any services to Gilchrist in connection with the Third Offering.

86. Contrary to what he told investors, Novinger never personally invested in the Third Offering.

87. As of May 13, 2026, investors have been repaid only about $637,881 of the $1,298,076 they invested.

**The Fourth Offering**

88. Between February and October 2025, Novinger and Gilchrist raised a total of $200,000 from Investor U and Investor V, both of whom live in Oklahoma. They came to Gilchrist through Novinger, whom they had contacted after listening to Novinger's former radio show.

89. Gilchrist and Novinger each told Investor U (in the spring of 2024) and Investor V (from December 2024 through around September 2025) that Gilchrist would use their money to buy tax liens. Defendants also told investors that they would receive a 20% annual return—10% every six months. Gilchrist and Novinger explained to Investor U and Investor V that such interest payments would be generated when the owners of the delinquent properties

repaid the tax liens together with interest, or after Gilchrist took ownership of, and then sold, the properties.

90. As part of these solicitations, Gilchrist and Novinger assured Investor U and Investor V that the investments were low-risk. Gilchrist explained that he would secure their investments with a lien on real estate. In a September 2024 text message, he told Investor V: "That's why I guarantee it with property so you have collateral in your hands."

91. To that end, on or about February 1, 2025, Gilchrist provided Investor U with a "Deed of Trust" documenting that the investor's $100,000 investment was secured by a lien on Gilchrist's house. He did the same for Investor V on or about August 29, 2025.

92. What Gilchrist did not tell the investors was that his house was already encumbered by a mortgage, leaving insufficient equity in the house to secure the investors' investments.

93. On or about February 1, 2025, and September 1, 2025, respectively, Investor U and Investor V executed an "Agreement Secured by Real Estate" with Gilchrist, which reflected the promised 20% annual return.

94. These agreements were investment contracts. Under the agreements, Investor U and Investor V had no role in the venture except investing in it. Once they did, their fortunes depended entirely on Gilchrist's tax

lien expertise. They reasonably expected profits of 10% every six months, derived solely from Gilchrist's efforts.

95. Earlier in 2025, Novinger and his wife Rebecca had loaned Gilchrist at least $30,000. As Novinger knew, but did not disclose before Investor V invested, Gilchrist was already several months in default on that loan, having failed to make a single payment to the Novingers.

96. Novinger similarly failed to tell either investor about his concern that Gilchrist may not have actually purchased tax liens or about Gilchrist's refusal to provide any evidence of the tax liens in connection with the Third Offering.

97. Gilchrist never purchased tax liens with Investor U's and Investor V's money. Instead, he misappropriated it for personal purposes and to pay investors from earlier offerings.

**Novinger Acted As An Unregistered Broker**

98. Between March 2023 and September 2024, Novinger acted as an unregistered broker in connection with the Third Offering by:

(a) actively soliciting investors to invest in Gilchrist's securities offerings;

(b) advising investors whether to re-invest or withdraw their investment;

(c) relaying to investors the promissory notes' high interest rates and purported low-risk nature;

(d) arranging and participating in sales calls between prospective investors and Gilchrist;

(e) helping investors complete the necessary investment documents, and forwarding these investment documents on investors' behalf;

(f) helping investors transfer funds to Gilchrist, including by taking custody of at least one investor's investment check; and

(g) delivering the completed promissory notes to the investors and Gilchrist.

99. Novinger was not registered as a broker with the Commission or associated with a broker registered with the Commission between March 2023 and September 2024—when he engaged in the activities described above.

**Novinger Associated With A Broker When The Commission Had Barred Him From Doing So**

100. Novinger also associated with a broker because he acted as a broker himself.

101. In 2016, the Commission Order permanently barred Novinger from association with any broker. Through the broker activity he performed in connection with the Third Offering, Novinger associated with a broker in contravention of the Commission Order. The Commission never consented to Novinger being associated with a broker.

## COUNT I

## VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT

**(Against Defendant David T. Gilchrist with Respect to All Offerings)**

102. Paragraphs 1 through 97 are realleged and incorporated by reference as though fully set forth herein.

103. Gilchrist, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has (a) knowingly or with severe recklessness employed devices, schemes and artifices to defraud; (b) knowingly, with severe recklessness, or negligently obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, with extreme recklessness, or negligently engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

104. By engaging in the conduct described above, Defendant Gilchrist violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

## COUNT II

## VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT

**(Against Defendant Christopher A. Novinger With Respect to the Third Offering)**

105. Paragraphs 4 through 18, 59 through 87, and 98 through 101 are realleged and incorporated by reference as though fully set forth herein.

106. Novinger, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has (a) knowingly or with severe recklessness employed devices, schemes and artifices to defraud; (b) knowingly, with severe recklessness, or negligently obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, with extreme recklessness, or negligently engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

107. By engaging in the conduct described above, Defendant Novinger violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

**COUNT III**

**VIOLATIONS OF SECTIONS 17(a)(1) and 17(a)(3)
OF THE SECURITIES ACT**

**(Against Defendant Christopher A. Novinger
with Respect to the Fourth Offering)**

108. Paragraphs 6 through 8, 10 through 16, 18, 74 through 81, and 88 through 97 are realleged and incorporated by reference as though fully set forth herein.

109. Novinger, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has (a) knowingly or with severe recklessness employed devices, schemes and artifices to defraud; (b) knowingly, with extreme recklessness, or negligently engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

110. By engaging in the conduct described above, Defendants violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), and 77q(a)(3)].

## COUNT IV

## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT RULE 10b-5

## (Against Defendant David T. Gilchrist with Respect to All Offerings)

111. Paragraphs 1 through 97 are realleged and incorporated by reference as though fully set forth herein.

112. Gilchrist, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

113. Gilchrist acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

114. By reason of the foregoing, Defendant Gilchrist violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT V

## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT RULE 10b-5

### (Against Defendant Christopher A. Novinger with Respect to the Third and Fourth Offerings)

115. Paragraphs 4 through 18 and 59 through 101 are realleged and incorporated by reference as though fully set forth herein.

116. Novinger, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

117. Novinger acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

118. By reason of the foregoing, Defendant Novinger violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT VI

## AIDING AND ABETTING VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT

**(Against Defendant Christopher A. Novinger with Respect to the Third and Fourth Offerings)**

119. Paragraphs 4 through 18, and 59 through 101 are realleged and incorporated by reference as though fully set forth herein.

120. Gilchrist committed primary violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act.

121. By reason of the foregoing and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Novinger, with respect to the Third and Fourth Offerings, aided and abetted, and is therefore liable for, the primary violations committed by Gilchrist of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act because Novinger knowingly or recklessly provided substantial assistance to Gilchrist's violations of these provisions. Unless enjoined, Novinger will likely again aid and abet violations of these provisions.

122. By engaging in the conduct described above, Defendant Novinger aided and abetted Gilchrist's violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

## COUNT VII

## AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT RULE 10b-5

**(Against Defendant Christopher A. Novinger with Respect to the Third and Fourth Offerings)**

123. Paragraphs 4 through 18, and 59 through 101 are realleged and incorporated by reference as though fully set forth herein.

124. By virtue of the conduct alleged herein, Gilchrist committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

125. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Novinger, with respect to the Third and Fourth Offerings, aided and abetted, and is therefore liable for, the primary violations committed by Gilchrist of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5], because Novinger knowingly or recklessly provided substantial assistance to Gilchrist's violations of these provisions. Unless enjoined, Novinger will likely again aid and abet violations of these provisions.

126. By engaging in the conduct described above, Defendant Novinger aided and abetted Gilchrist's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**COUNT VIII**

**VIOLATIONS OF SECTION 15(a)(1)
OF THE EXCHANGE ACT**

**(Against Defendant Christopher A. Novinger
with Respect to the Third Offering)**

127. Paragraphs 4 through 5, 7 through 18, 59 through 87, and 98 through 101 are realleged and incorporated by reference as though fully set forth herein.

128. By engaging in the conduct described above, Novinger engaged in the business of effecting transactions in securities for the account of others; and directly or indirectly made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

129. By reason of the foregoing, Defendant Novinger violated and, unless restrained and enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**COUNT IX**

**VIOLATIONS OF SECTION 15(b)(6)(B)(i) OF THE EXCHANGE ACT**

**(Against Defendant Christopher A. Novinger with Respect to the Third Offering)**

130. Paragraphs 4 through 5, 7 through 18, 59 through 87, and 98 through 101 are realleged and incorporated by reference as though fully set forth herein.

131. In 2016, the Commission issued the Commission Order that permanently barred Novinger from association with any broker.

132. Novinger, with respect to the Third Offering, in contravention of the Commission Order, willfully associated with a broker through his activities described above.

133. The Commission did not consent to Novinger becoming, or to be, associated with a broker.

134. By reason of the foregoing, Defendant Novinger violated and, unless restrained and enjoined, will continue to violate Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)].

**COUNT X**

**EQUITABLE CLAIM**
**FOR UNJUST ENRICHMENT**

**(Against Relief Defendant Rebecca Novinger**
**with Respect to the Third Offering)**

135. Paragraphs 4 through 18, and 59 through 87, and 98 through 99 are realleged and incorporated by reference as though fully set forth herein.

136. Relief Defendant Rebecca Novinger, directly or indirectly, received funds or benefited from the use of such funds, which are the proceeds, or are traceable to the proceeds, of Defendants' unlawful activity alleged with respect to the Third Offering.

137. Rebecca Novinger has no legitimate claim to these funds that she received or from which she otherwise benefited, directly or indirectly.

138. Based upon the allegations set forth above, Rebecca Novinger has been unjustly enriched by her direct or indirect receipt of or benefit from investor funds.

139. The Commission is entitled to an order requiring Relief Defendant Rebecca Novinger to disgorge the proceeds of investor funds she received or from which she benefited, either directly or indirectly.

## RELIEF REQUESTED

**WHEREFORE,** plaintiff United States Securities and Exchange Commission respectfully requests that this Court find that Defendants David T. Gilchrist and Christopher A. Novinger violated the securities laws in the manner set forth herein, and that Relief Defendant Rebecca Novinger has been unjustly enriched by her direct or indirect receipt of or benefit from investor funds. Plaintiff further requests that this Court enter a Final Judgment that:

**I.**

Permanently enjoins Defendants David T. Gilchrist and Christopher A. Novinger, their agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

**II.**

Permanently enjoins Defendant Christopher A. Novinger, his agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, violating Sections 15(a)(1) and 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. §

78o(a)(1), 78o(b)(6)(B)(i)].

**III.**

Permanently enjoins Defendants David T. Gilchrist and Christopher A. Novinger from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, participating in the issuance, purchase, offer, or sale of any security, except that such injunction shall not prevent Defendants from purchasing or selling securities listed on a national securities exchange for their personal accounts.

**IV.**

Orders Defendants David T. Gilchrist and Christopher A. Novinger (on a joint and several basis with Relief Defendant Rebecca Novinger) to disgorge the ill-gotten gains received because of the violations alleged in this Complaint, including prejudgment interest, pursuant to Section 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

**V.**

Orders Defendants David T. Gilchrist and Christopher A. Novinger to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

Orders Relief Defendant Rebecca Novinger, on a joint and several basis with Defendant Christopher A. Novinger, to disgorge all funds she received from Defendants' ill-gotten gains or by which she has been unjustly enriched, including all investor funds transferred to her or used for her benefit with respect to the Third Offering, wherever located, including jurisdictions outside of the United States, including prejudgment interest thereon.

**VII.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

The Commission hereby requests a trial by jury.

Dated: August 31, 2026

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: /s/ Jonathan S. Polish
Jonathan S. Polish
Illinois Bar Number 6237890
(PolishJ@SEC.gov)
(*pro hac vice* application pending)
James G. O'Keefe
Illinois Bar Number 6293490
(OKeefeJ@SEC.gov)
(*pro hac vice* application pending)

United States Securities
and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

Local Counsel:
Patrick Disbennett
Texas Bar No. 24094629
(DisbennettPa@SEC.gov)
United States Securities
and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 978-6442
Facsimile: (817) 978-4927

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES SECURITIES**
**AND EXCHANGE COMMISSION**